(A.R.D. 167)

Gucker & Goldstein *v.* United States

Entry No. 458292.

Third Division, Appellate Term

(Decided February 4, 1964)

*Jordan & Klingaman* (*Edward F. Jordan* of counsel) for the appellant.
*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before Donlon and Richardson, Judges; Donlon, J., concurring

Richardson, Judge: This is an application for review of the decision and judgment of a single judge sitting in reappraisement and holding that the appraised value is the proper dutiable value of the involved merchandise. From the judgment, entered on January 22, 1962, and reported in 48 Cust. Ct. 516, Reap. Dec. 10144, the importer appeals.

The facts are not in dispute. The subject merchandise consists of one parcel of nylon laces which was exported from France on August 23, 1957, and entered at New York on August 28, 1957. The merchandise was invoiced and paid for in French francs. In making entry in United States dollars, the importer converted these francs into dollars at the rate of $0.00285500, which is the equivalent of 350 francs to the dollar, and computed the entered value of the parcel totaling French francs 138,369.30, less nondutiable charges of French francs 11,339.70, at $363.

The merchandise was appraised in French francs as entered, notwithstanding which the importer filed a timely appeal for reappraisement. It is conceded that export value is the proper basis of valuation of the involved merchandise. However, the importer contended before the single judge that appraisement of the merchandise should have been made in French francs at the dollar rate of $0.00237437, which is the equivalent of 420 francs to the dollar. The use of this latter, more depreciated, rate by the appraiser in finding value would have resulted in the reduction of the market value of the involved merchandise from $363 to $302.

It will be observed that the rate used by the importer in making entry approximates the rate of exchange stated on the invoice, namely, French francs 349.95 to the dollar. However, it nowhere appears in the record why the importer did not utilize the claimed rate in the entry in making deduction from the invoice value, pursuant to 19 U.S.C.A., section 1487 (section 487, Tariff Act of 1930, as amended). In any event, the importer's failure to make such deduction from invoice value at the time of entry did not prevent it from contending for such deduction on reappraisement. (See *Collin & Gissel* v. *United States*, 72 Treas. Dec. 1210, Reap. Dec. 4183, affirming *Collin & Gissel* v. *United States*, 71 Treas. Dec. 1227, Reap. Dec. 4004; 19 U.S.C.A., section 1503 (section 503, Tariff Act of 1930, as amended).)

Certain currency exchange practices were put into effect by the French Government prior to the exportation of the subject merchandise, evidence of which practices were before the single judge (exhibits A and B). These currency exchange practices are embodied in decrees enacted by the Government of France on August 10, 1957. The material portions of decree No. 57–910, of that date, read as follows:

Article 1—In order to assure the re-establishment of the balance of payments in the franc zone, all settlements (payments) between Metropolitan France, . . . on the one hand and countries outside of the franc zone on the other hand, are subject to a withholding or give rise to a payment.

Art. 2—The rate of the withholding and of the payment is established at 20% of the amount of the settlements.

Art. 3—The rules implementing the present Decree shall be established by Ministerial Decree signed by the Minister of Finance, Economic Affairs and the Plan and by the other interested ministers, if any.

In particular, it may be decided in this way to suspend the withholding with regard to settlements relating to imports of certain energy products or raw materials and to adjust accordingly the amount of the payment.

Relevant financial provisions of the ministerial decree, of the same date, read as follows:

Article 1—The withholding shall be paid by every purchaser of foreign exchange at the time of the settlement of the counter-value in francs of this foreign exchange.

The payment shall be collected by any seller of foreign exchange at the time of the collection of the counter-value in francs of said foreign exchange.

Art. 2—The rate of the withholding or that of the payment applies to the counter-value in francs of the foreign exchange bought or sold.

Art. 3—The withholding is collected or the payment made for the account of the foreign exchange stabilization fund by the approved intermediary through whom the client effects the purchase or sale of the foreign exchange.

The applicable commercial provision of said ministerial decree reads as follows:

Art. 3—The payment is suspended for transfers of foreign exchange relating to exports . . .: a) In the case of the products set forth, with respect to Metropolitan France . . . in List III annexed to the present Ministerial Decree;

The involved merchandise was included in the List III category of merchandise suspended from the operation of the aforesaid decrees.

It appears that, on August 23, 1957, the date of exportation of the subject merchandise, the Federal Reserve bank at New York, in line with the aforementioned French currency exchange reforms, certified two rates of exchange for the French franc, namely, a nominal rate of $0.00285795, designated as category (1), and a rate of $0.00237437, designated as category (2). The former rate was the equivalent of 350 francs to the dollar, while the latter rate was the equivalent of 420 francs to the dollar. Owing to the fact that the former rate varied less than 5 per centum from the previously established quarterly rate of $0.00285500, customs personnel were instructed to use such prior quarterly rate when appraising merchandise or assessing duties under the category (1) rate (T.D. 54431). And as has been previously noted herein, this prior quarterly rate of $0.00285500 was the rate that was used by the importer in computing the entered value of the merchandise, while the category (2) rate is the rate contended for by the importer before the single judge for appraisement purposes.

The importer argued before the single judge that the aforementioned decrees of the French Government created a charge upon the exportation of the involved merchandise which was in the nature of an export tax, that such tax was reflected in the more appreciated rate of exchange (350 francs to the dollar), at which the importer was required to purchase in dollars the merchandise invoiced in francs, and that such export tax cannot properly constitute an element of statutory export value. In the brief submitted by counsel for the importer to the single judge, the contention of the importer is explained on pages 5 and 6 as follows:

In the case of a product, as to which the Decree was not suspended because the product was not included in List III, where the invoice amount was 42,000 francs, the purchaser, an American importer, would remit to an authorized commercial bank in France the sum of $100. which amount would be converted

by the bank into French francs at the rate of 420 francs to the dollar and the total amount in francs thus realized (42,000) would be paid to the seller in settlement of his invoice.

In the case of a product as to which the Decree had been suspended because, as in the instant case, it was included in List III, where the invoice amount was 42,000 francs, the purchaser, an American importer, was required to remit to an authorized commercial bank in France the amount of the invoice, 42,000 francs, in U.S. dollars at the rate of 350 francs to the dollar or $120. This amount was converted by the bank into francs at the rate of 420 francs to the dollar and of the total amount of francs thus realized (50,400) 42,000 francs were paid to the seller in settlement of his invoice for that amount and the balance, 8,400 francs or 70 francs for each dollar, was retained by the bank and deposited in the foreign exchange stabilization fund, an agency of the French Government. Accordingly, no part of this sum of 8,400 francs accrued to the benefit of the seller.

In the latter case, it is clear that the amount paid in U.S. dollars at the rate of 350 francs to the dollar, as required by the Decree, included not only the amount due the seller for the merchandise but also an additional amount (8,400 francs in the illustration above) exacted by the French Government for the privilege of exporting the merchandise. It is submitted that this additional payment, although not so designated, is, in practical effect, an export tax.

The Government, while agreeing in substance to the importer's interpretation of the decrees, took the position that no export tax was involved in the transaction, in view of the fact that, under French law, the exporter invoiced the merchandise in francs, specified the rate of conversion on the invoice, and thus gave notice of the selling price devoid of any surcharge or tax.

The single judge noted in his opinion that "An examination of the facts involved herein, particularly with respect to when the tax occurs, establishes that the tax or action of France in retaining the difference between 350 francs and 420 francs per dollar in an economic stabilization fund was imposed at the *time of settlement or exchange of currency* and not at the time of exportation." [Italics quoted.] The single judge went on to conclude that such action on the part of the French Government did not amount to an export tax, but was merely a tax on the conversion of currency involving either imports or exports. Consequently, the trial judge sustained the appraised value of the involved merchandise.

In connection with the instant application, the parties have advanced the same arguments in support of their respective contentions as were made before the single judge. And, in an endeavor to meet the conclusion of the single judge regarding the time element involved in the levying of so-called tax, the importer makes still another argument. The importer contends that the tax accrued at the time of exportation of the merchandise, that, at such time, the exporter was obligated under French law to obtain sufficient dollars from the im-

porter to cover the invoice as well as the amount due the French Government, and that deferment of the payment of such sums did not operate to change the situation.

We think that the question before us should turn on the interpretation to be given to the French decrees placed in evidence as to whether or not an export tax was involved in the purchase and sale of the involved merchandise. There is no question but that, if an export tax was paid upon the exportation of the merchandise in question, such tax could not properly constitute an element of export value. *United States* v. *Tadross & Co. et al.*, 14 Ct. Cust. Appls. 10, T.D. 41528; *Sternfeld* v. *United States*, 12 Ct. Cust. Appls. 172, T.D. 40065.

As we interpret and apply the French decrees to the facts of this case, we do not think the instant transaction involved the payment of an export tax or even a tax on the conversion of currency. To begin with, it has been conceded to be the fact that the subject merchandise was both *invoiced and paid for in French francs*, without any conversion of currency. This fact alone, in our judgment, takes the transaction outside of the operation of the decrees in question, which are concerned only with the conversion of foreign exchange into French francs and vice versa. There is no showing in the stipulation submitted that an additional payment of 70 francs above the 350 francs received by the French exporter was actually paid by the exporter or the American importer. Certainly, the decrees did not require such a payment. The relevancy of the French decrees to the facts before us is further made suspect, in view of the concession made by the parties to the effect that the francs used in the purchase of the subject merchandise were not restricted. Not all French francs used in the payment for merchandise exported from France were covered by these decrees. Only those that were controlled through the French bank. In any event, the consummation of the export transaction here involved in uncontrolled French francs is irreconcilable with Government regulation, contained in notice No. 637 of the French Foreign Exchange Office, which prohibits the making of contracts or invoices pertaining to List III merchandise in French francs and requires such contracts or invoices to be made out in a foreign currency. (See exhibit B, p. 12.)

The case was presented to and decided by the single judge on the theory that the dollars derived from the sale and exportation of List III merchandise were converted into francs at an appreciated rate, so that the French exporter received full value of the invoice in francs, and, in addition, a sum of money in francs was also paid to the French Government from these dollar proceeds. We do not agree that such was the *modus operandi* of the main decree. We do not read into

decree No. 57–910 of August 10, 1957, any intention on the part of the French Government, as is expressed in the theory on which the instant case was presented and decided, to make the seller of foreign exchange, whomever he might be, the American importer in the case at bar, pay a tax, however labeled. In fact, it clearly appears that the French Government intended that sellers of foreign exchange, with certain exceptions, should pay less for the francs they received in exchange for foreign currency by reason of Government subsidy. This fact is borne out in the excerpt from the French trade publication, Moniteur Officiel du Commerce et de L'Industrie, placed in evidence as part of exhibit B at page 2 of the exhibit, where, when explaining the effect of the main decree upon foreign tourists (a class of "sellers of foreign exchange"), among other things, the article states:

> With regard to invisible exports, the fact that foreign tourists shall henceforth pay 20% less for the francs which they purchase, results in the cancellation of certain specific subsidy provisions (subsidy to hotel trade, provisions governing sales to foreign tourists, gasoline coupons).

Notice No. 637 of the French Foreign Exchange Office sought to prevent direct purchasing of francs by foreign purchasers of French goods for exportation at a savings, and to allow the French exporter of preferred merchandise, whom the French Government intended to help, to obtain the savings in the form of the 20 per centum subsidy.

We read the main decree as allowing any seller of dollar proceeds of a List III export transaction to receive full value therefor upon conversion at the rate of exchange then prevailing in the Paris market, with nothing accruing to the Government fund in such a transaction. The Government fund profited from a List III export transaction only when the exporter accepted payment for such merchandise by way of a debit to a foreign-owned French franc account instead of by way of the required foreign exchange. The reason for this is that, inasmuch as the French exporter of List III merchandise did not stand to gain a subsidy under the decree by surrendering foreign exchange proceeds, it mattered little to him whether he got dollars or francs for his merchandise. But, for fiscal reasons, it did matter to the French Government whether or not the French exporter turned his back on an opportunity to obtain foreign exchange. And so, where the French exporter accepted payment by way of a transfer of funds from a foreign-owned franc account instead of in foreign currency, he was taxed or penalized through the withholding of 20 per centum of the francs accruing to him by the authorized intermediary bank. In such a case, the tax or penalty could be enforced, because the movement of funds in such instance was controlled by the Government. The bank simply paid the sum withheld from the

exporter over to the Government fund.[1]  Article 5 of the ministerial decree points up the feasibility of the French exporter accepting payment for List III merchandise in foreign currency, rather than in banked French currency, even though he derived no subsidy therefrom, in order to *avoid* payment of a tax or penalty out of his proceeds.  The ministerial decree imposed no tax, however, on the exporter of List III merchandise who, as here, accepted, in lieu of the required foreign exchange, payment in French francs derived from sources not controlled by the Government.

We find support for our interpretation of the French decrees from the first article of the main decree.  It will be observed therefrom that the decree owes its existence to the French Government's concern over its unfavorable balance of payments deficit, and consequent endeavor to make corrective adjustments in its balance of payments account. The main decree then proceeds to favor exports generally through subsidization, and to discourage imports generally through taxation, both at a uniform rate of 20 per centum, leaving the implementation of the decree and the giving of preferential treatment to particular exports and imports to subsequent decrees.  A ministerial decree stepped into the breach and set up lists of preferred imports (Lists I and II) which were not taxed and a list of nonpreferred exports (List III) which were not subsidized, and suspended the listed imports and exports from the operation of the main decree.  The main decree provided for a general devaluation of the French franc; but a subsequent ministerial decree effected a partial devaluation of the franc, insofar as certain import and export commodity transactions were concerned.

Furthermore, by ministerial decree, the French Government also endeavored to increase its holdings of foreign exchange.  Thus, under article 4 of the financial provisions of the ministerial decree of August 10, 1957 (exhibit B, pages 5 and 6), the Government fund subsidized foreign sellers possessing French franc accounts, and to whom French importers of preferred imports were obliged to pay for such imports with foreign exchange, but instead were permitted to make payment in francs by a credit to such foreign franc accounts.  In such cases, the Government fund added a sum to these accounts equal to 20 per centum of the francs paid into them by the French importers. And, conversely, under article 5 of the same ministerial decree, as previously noted herein, the French exporter of nonpreferred mer-

---

[1] Article 5 of the ministerial decree of August 10, 1957 (exhibit B, p. 6), states:

In the event that the settlement of an export which does not benefit from the payment and which has been made the subject matter of a contract calling for a foreign exchange selected as money of account is effected by debiting to a foreign account in francs, the approved intermediary will withhold from the settlement to be made to the exporter and will pay into the foreign exchange stabilization fund an amount equal to the amount of the payment from which the exporter would not have benefited if the settlement had been made in foreign exchange.

chandise, to whom was due foreign exchange in payment for such exports, was penalized or taxed a corresponding 20 per centum, if he accepted payment in francs derived from foreign-owned French franc accounts, in lieu of the foreign exchange.

The foregoing constitutes the salient features of the main and implementing decrees as we read them. In our opinion, they imposed no tax upon the exportation of nonpreferred and nonsubsidized merchandise designated in List III, such as that at bar, or upon the uncontrolled foreign exchange proceeds derived therefrom. The tax burden was borne by the French importer of nonpreferred merchandise excluded from either List I or II, with the one exception not here relevant, where the exporter of List III merchandise paid a tax in the form of a penalty.

We, therefore, conclude that the evidence of record fails to establish the payment of an export tax upon the exportation of the merchandise at bar, pursuant to the involved French decrees. Inasmuch as the question of the tax constitutes the only question presented to the single judge, and forms the only basis upon which the appraisement was assailed, it follows that the decision of the single judge sustaining the appraised value must be upheld, although we arrive at this conclusion for quite different reasons than those advanced by the single judge.

Accordingly, we find as matters of fact:

1. That the merchandise involved herein consists of nylon laces, exported from France on August 23, 1957.

2. That such or similar merchandise was freely offered for sale to all purchasers for exportation to the United States, in the principal markets of France, in the usual wholesale quantities and in the ordinary course of trade.

3. That neither such nor similar nylon laces were, on or about the date of exportation herein, freely offered for sale or sold in France for home consumption.

4. That the involved merchandise was invoiced in and paid for in French francs at a price which did not include an export tax.

5. That had the involved merchandise been invoiced in and paid for in United States dollars under applicable French law:

(a) The seller would have been permitted to surrender said dollars for francs at the exchange rate of 350 francs to the dollar and retain the entire proceeds of such exchange transaction.

(b) No tax would have accrued and been payable to any agency of the French Government upon and by reason of the exportation of such merchandise from France.

We conclude as matters of law:

1. That the proper dutiable value of the involved merchandise is export value, as that value is defined in section 402(d) of the Tariff

Act of 1930, there being no foreign value in existence for such or similar merchandise.

2. That such value is the appraised value herein. The judgment of the trial court is affirmed.

Judgment will be entered accordingly.

## CONCURRING OPINION

DONLON, Judge: I concur with Judge Richardson that the judgment of the trial judge should be affirmed. That judgment was that export value is the basis of appraisement of the instant merchandise, and that the appraised value is the export value. However, I have reached this decision for reasons different from those expounded in my colleague's opinion, and I deem it advisable to state my reasons.

I find no issue before us that is justiciable in an appeal to reappraisement. There is no issue as to the basis of appraisement, conceded to be export value. The merchandise was exported from France, and there appears to be neither argument nor ground for argument that appraisement should not be in the currency of the country of export. Appraisement was in French francs.

What plaintiff's appeal to reappraisement appears to challenge is the advisory recommendation of the appraiser, made to the collector, with respect to the rate of exchange appropriate for conversion of the French franc valuation into dollars, when the collector liquidated the entry. This the collector has not yet done.

The appraiser is required to include in his report to the collector "an advisory statement of his views as to what type of certified rate . . . is applicable to the merchandise involved" whenever the Federal Reserve bank has certified multiple rates of exchange for the currency in which appraisement is made. (Cust. Reg., sec. 16.4(2).) As of the date of exportation of this merchandise from France, there were two rates of exchange for French francs that had been certified by the Federal Reserve bank. The appraiser advisorily recommended to the collector which one of these two rates was the rate appropriate for use by the collector in liquidating the merchandise.

It requires no citation of authority for the proposition that appeal to reappraisement does not lie from any of the appraiser's advisory recommendations to the collector. Moreover, such recommendations are not subject to protest as such. The decision of the collector (whether in accordance with the appraiser's recommendation, or to the contrary) may, of course, be protested.

I do not agree that *Collin & Gissel* v. *United States*, 71 Treas. Dec. 1227, Reap. Dec. 4004, is authority for the appraiser to convert foreign currency in this case, or for appellant (plaintiff below) to raise the issue of currency rate in reappraisement. Indeed, it seems clear

that the appraiser has not converted currency in this case, as appellee's brief correctly points out.

In *Collin & Gissel*, the merchandise was imported from Germany. The obligation of the appraiser is to appraise in the currency in which the merchandise is usually bought and sold. In that case, it was German currency. The importer entered the merchandise at a value expressed in United States dollars. The appraiser, therefore, had to use some rate of exchange to change the entered value into German reichsmarks. This he did.

The court found that what the appraiser did in ascertaining or estimating the value of the merchandise, was properly subject to review on appeal to reappraisement, including currency conversion from dollars into reichsmarks.

As Judge Richardson aptly points out in his opinion, appellant's quarrel with the appraisement is that the appraiser should have valued the merchandise by using a certain exchange, the use of which would have reduced the *dollar* value of the merchandise from $363 to $302.

Here, there was no conversion of French francs by the appraiser. There was no need for it. Entry was in French francs. That was the currency in which the merchandise was usually bought and sold for export to the United States.

In *Collin & Gissel, supra,* at page 1228, the difference in the duties of the appraiser and the collector, with respect to currency conversion, was stated by the court:

No statutory provision or regulation has been cited which forbids the appraiser to appraise merchandise in the currency of the country of exportation. It is the duty of the appraiser to return the foreign or export value, whichever is the higher, and if the dollar prices on the invoice do not correctly represent the prices at which the goods are freely offered for sale to all purchasers in the country of exportation, either because of an agreed rate of exchange, or for any other reason, it is the duty of the appraiser to disregard the invoice prices. Section 500(a)(1) of the Tariff Act of 1930 provides that it is the duty of the appraiser to—

appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining *or estimating* the value thereof by all reasonable ways and means in his power, any statement of cost * * * in any invoice * * * to the contrary notwithstanding.

Where imported merchandise is appraised in foreign currency, it is the duty of the collector, for the purpose of assessing customs duties, to convert the value into currency of the United States in the manner provided in section 522 of the Tariff Act of 1930. See *Cablat* v. *United States*, 11 Ct. Cust. Appls. 304, T.D. 39127, and *United States* v. *Herschbach*, 15 Ct. Cust. Appls. 44, T.D. 42139. Such action by the collector does not become necessary, however, until after final appraisement, and then only when the dutiable value before him is in foreign currency. The rule that the collector shall convert the currency in such cases does not operate as a limitation to the power of the appraiser to ascertain and estimate the statutory foreign or export value of the goods by "all reasonable ways and means". For reasons why in some instances it is

necessary that merchandise be appraised in foreign currency rather than United States dollars, see *Giovanni Ascione* v. *United States*, T.D. 37252, G.A. 8077. [Emphasis quoted.]

In summary, the appraiser is required to value merchandise. When, as here, the basis is export value, he may value the merchandise in the currency of the country of exportation. He did so. This called for no currency conversion, and he did not convert. An appraiser is required also to make certain advisory recommendations to the collector. In this case, the appraiser made two advisory recommendations. One was as to the tariff classification proper for assessment of duties. The other advisory recommendation by the appraiser was as to the rate of exchange proper for conversion of the French franc valuation into United States dollars for purposes of assessing duties.

Neither of these advisory recommendations is subject to review on appeal from the appraisement.

There is no fact before us, and no argument has been adduced, to show that appellant (plaintiff below) questions the export value, in French francs, as found by the appraiser. There are no proofs as to some other *French franc* valuation which appellant deems proper. The stipulated record supports the *French franc* value which the appraiser found.

Inasmuch as the appraiser's advisory recommendation as to currency rate is, in my opinion, not before the court in this litigation, I refrain from expressing at this time any views as to which of two exchange rates is the proper rate for the collector to use in liquidating the merchandise.

For reasons stated, I affirm the judgment below, but not the findings.